UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JAMES WADE, individually and on behalf of all others similarly situated | § § § | |
| Plaintiff. | § § § | |
| VS. | § § | CIVIL ACTION NO. 3:17–CV–00169 |
| FURMANITE AMERICA, INC. | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION AND ORDER

Pending before this Court is Plaintiff's Motion for Conditional Certification Under the Fair Labor Standards Act ("Motion"). (Dkt. 18). This Court has authority to enter this order pursuant to 28 U.S.C. § 636(b)(1)(A).

Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court GRANTS the Motion.

### I. BACKGROUND

Furmanite America, Inc. ("Furmanite") is a pipeline inspection and maintenance company with employees working from coast-to-coast.

Plaintiff James Wade ("Wade") brought this lawsuit against Furmanite for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, on behalf of himself and similarly situated pipeline inspectors. He has requested that this Court certify a class consisting of all inspectors that were employed out of Furmanite's Tulsa

branch office ("Tulsa Group Inspectors").[1] Wade claims that Furmanite required him and all Tulsa Group Inspectors to work in excess of 40 hours per workweek without any overtime compensation. Specifically, Wade alleges that Furmanite pays its Tulsa Group Inspectors a day rate, but disguises this fact by maintaining pay records that artificially divide the day rate compensation into straight time pay and overtime pay. Wade contends that a close inspection of his time records reveals the subterfuge because, for example, when he "worked five days, he was *always* paid, supposedly, for 40 hours of straight time pay and for 12.22 overtime hours," and a substantially similar pattern holds for six and seven day work weeks. (Dkt. 24 at 4–7).[2] Wade seeks conditional certification of Tulsa Group Inspectors, arguing that Tulsa Group Inspectors are similarly situated because they have been subjected to Furmanite's disguised day rate pay scheme.

In response, Furmanite vociferously argues that it has fully complied with the FLSA. At oral argument, Furmanite's counsel explained that it paid Wade an hourly rate. However, because Wade worked on a project where Furmanite's client paid a day rate, Furmanite calculated and set Wade's hourly rate based on a function of the day rate pay it received from its client and its desired daily profit. For example, if Company X contracted with Furmanite to provide inspection services for a 10 hour workday, at a rate of $1,000 a day, Furmanite would first determine the amount of profit it wanted to make per day. If Furmanite decided it wanted to make, say, $400 per day in profit, the

---

[1] Tulsa Group Inspectors consist of approximately 250 employees who are based out of Tulsa, Oklahoma, but work throughout the United States.

[2] Wade contends that when he "worked six days in a week, he was *always* paid ... for 40 hours of straight time pay and 20 hours overtime," and when he "worked seven days in a week, he was always paid ... for 27.78 overtime hours and 40 straight time hours." (Dkt. 24 at 4–5).

remaining $600 would become its staffing budget. Furmanite would then perform a backward calculation based on the $600 staffing budget and the 10 hour workday requirement to determine the hourly rate that would allow it to pay its employee straight time and overtime all within the $600 budget. Furmanite contends that although this practice is somewhat related to its receipt of a day rate payment from a client, it is not the same as paying its own employees a day rate.

In support of his Motion, Wade has submitted a declaration stating that he worked for Furmanite as an inspector in Arkansas from September 2015 to February 2016. Wade has also submitted the declaration of Jeff Boyd, who states that he worked for the company as an inspector in New York and Connecticut from April 2015 to March 2016. Both Wade and Boyd claim that they worked more than 40 hours per week, but were not paid for the overtime they worked. Furmanite acknowledges that both Wade and Boyd worked for the company during the periods of time that they respectively declare, but disputes the specific job titles and corresponding job duties that they identify in their sworn declarations.[3] Furmanite also rejects Wade and Boyd's claim that they were paid anything other than straight time and overtime when appropriate. The parties agree that Wade and Boyd were Tulsa Group Inspectors.

---

[3] Although Wade's specific job title and duties are hotly contested, the Court need not weigh in on this dispute at this time. *See, e.g., Gronefeld v. Integrated Prod. Servs., Inc.*, No. 5:16-CV-55, 2016 WL 8673851, at *4 (W.D. Tex. Apr. 26, 2016) (explaining that dispute regarding a plaintiff's job title allegations "is a factual dispute better resolved based on documents produced and the credibility of witnesses"—i.e., not at the conditional certification stage).

## II. APPLICABLE LAW

The FLSA requires employers to pay certain employees one and one-half times the employee's regular rate of pay for hours worked in excess of 40 hours per week. The FLSA further authorizes an employee to bring a "representative" or "collective action" against his employer for unpaid overtime wages on behalf of himself and other employees "similarly situated." 29 U.S.C. § 216(b). Unlike class actions in which potential class members may choose to opt-out of the lawsuit, FLSA collective actions require potential class members to notify the court of their desire to opt-in to the action. *Id.* Although the FLSA does not expressly require certification for a collective action to proceed, certification has been recognized as a useful case management tool for district courts to employ in appropriate cases. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ("A collective action allows ... plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity.").

The decision on whether to certify a suit as a collective action under the FLSA and approve notice to potential plaintiffs is committed to the sound discretion of the court. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995). Notice to potential plaintiffs will not issue unless a court conditionally certifies the case as a collective action. *See Shaw v. Jaguar Hydrostatic Testing, LLC*, No. 2:15-CV-363, 2017 WL 3866424, at *3 (S.D. Tex. Sept. 5, 2017) ("[T]he sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn

4

become parties to a collective action only by filing written consent with the court. District courts have discretion in deciding whether to order notice to potential plaintiffs.") (internal quotation marks and citations omitted).

The Fifth Circuit has declined to adopt a particular test to determine when a court should certify a collective action or authorize notice in a FLSA action. That being said, most federal courts in this District have adopted the two-step approach set forth in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). This Court is no exception. *See Freeman v. Progress Residential Prop. Manager, LLC*, No. 3:16-CV-00356, 2018 WL 1609577, at *2 (S.D. Tex. Apr. 3, 2018) (Edison, J.) (applying the two–step *Lusardi* test).

The two stages of the *Lusardi* test are the "notice stage," followed by the "decertification stage." *See Mooney*, 54 F.3d at 1213–14. At the notice stage, the court conducts an initial inquiry into "whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the class." *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 519 (5th Cir. 2010) (citation omitted). Courts usually base this decision upon "the pleadings and any affidavits [that] have been submitted ...." *Mooney*, 54 F.3d at 1214. Because of the limited evidence available at this stage, "this determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class." *Id.* In fact, courts "appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 1214 n.8 (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)). At no point during the conditional certification stage should a court look

to the merits of the lawsuit's allegations. *See Vaughn v. Document Grp. Inc.*, 250 F. Supp. 3d 236, 239 (S.D. Tex. 2017) ("Neither stage of certification is an opportunity for the court to assess the merits of the claim by deciding factual disputes or making credibility determinations.") (quotation marks and citation omitted). If the court conditionally certifies the class, putative class members are given notice and the opportunity to opt-in. *See Mooney*, 54 F.3d at 1214. The case then proceeds through discovery as a representative action. *Id.*

At this initial stage of the *Lusardi* approach, courts in this District are split on the appropriate test to apply. Some courts require a plaintiff to establish three elements: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt-in to the lawsuit. *See Moreno v. Nat'l Oilwell Varco, L.P.*, No. 4:17-CV-782, 2018 WL 1932550, at *7 (S.D. Tex. Apr. 23, 2018) (Palermo, J.) (applying third element); *Ridley v. Regency Village, Inc.*, No. CV H-17-974, 2018 WL 1334813, at *8 (S.D. Tex. Mar. 15, 2018) (Miller, J.) (same); *Heeg v. Adams Harris, Inc.*, 907 F. Supp. 2d 856, 861 (S.D. Tex. 2012) (Rosenthal, J.) (same). On the other hand, a number of courts in this District have rejected the third element because it is not statutorily required. *See Williams v. Guardian Living Servs., Inc.*, No. 4:17-CV-1901, 2018 WL 1251927, at *2 (S.D. Tex. Mar. 12, 2018) (Ellison, J.) (declining to apply the third element); *Hernandez v. Robert Dering Constr., LLC*, 191 F. Supp. 3d 675, 681 (S.D. Tex. 2016) (Hanks, J.) (same); *Jones v. Cretic Energy Servs., LLC*, 149 F. Supp. 3d 761, 768 (S.D. Tex. 2015) (Lake, J.) (same).

This Court has previously considered the issue, determining that the two element approach is appropriate and that "[p]laintiffs need not present evidence that other individuals want to join the lawsuit to obtain conditional certification." *Freeman*, 2018 WL 1609577, at *6.

The second step of the *Lusardi* approach—the decertification stage—is triggered if a defendant files a motion for decertification after the opt-in period has concluded and discovery is largely complete. *See Mooney*, 54 F.3d at 1214. The Fifth Circuit has explained:

> At this [decertification] stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—i.e., the original plaintiffs—proceed to trial on their individual claims.

*Id.*

## III. DISCUSSION

### A.  CONDITIONAL CERTIFICATION IS PROPER

"As noted above, a plaintiff seeking to obtain conditional certification must make a minimal showing that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; and (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted." *Freeman*, 2018 WL 1609577, at *4 (internal quotation marks, alteration, ellipsis, and citation omitted).

This Court will evaluate the request for conditional certification in light of these two factors.

### 1. Whether Aggrieved Individuals Exist

Wade "need only show that it is reasonable to believe that there are other aggrieved employees who were subject to an allegedly unlawful policy or plan." *Austin v. Onward, LLC*, 161 F. Supp. 3d 457, 464 (S.D. Tex. 2015) (quotations marks and citation omitted). Here, in addition to Wade, one other individual—Boyd—has submitted a declaration stating that he also worked as a pipeline inspector for Furmanite, and he attests to having similar job duties and a similar compensation structure (day rate) as other inspectors such as Wade. Furmanite acknowledges that Wade and Boyd were both Tulsa Group Inspectors and that approximately 250 Tulsa Group Inspectors work throughout the country. As a result, the Court finds that Wade has provided more than sufficient proof that other aggrieved individuals exist, especially since Wade's burden is so low at this stage. *See Heeg*, 907 F. Supp. 2d at 862.

### 2. Whether the Aggrieved Individuals are Similarly Situated

To obtain conditional certification, Wade must show that "those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted." *Maynor v. Dow Chem. Co.*, No. CIV. A. G-07-0504, 2008 WL 2220394, at *6 (S.D. Tex. May 28, 2008). However, "similarly situated does not necessarily mean identically situated." *Jaso v. Bulldog Connection Specialists LLC*, No. 2:15-CV-269, 2015 WL 11144603, at *4 (S.D. Tex. Oct. 15, 2015) (quotation marks, alteration, and citation omitted). *See also Falcon v. Starbucks Corp.*, 580 F. Supp. 2d

528, 534 (S.D. Tex. 2008) ("Courts have repeatedly stressed that Plaintiffs must only be similarly—not identically—situated to proceed collectively.") (collecting cases). Instead, the relevant inquiry is whether Wade has sufficiently shown that other current and former Furmanite employees "were together the victims of a single decision, policy or plan ...." *Mooney*, 54 F.3d at 1214 n.8 (quotation marks and citation omitted). Generally, "[p]otential class members are considered similarly situated ... if they ... [have similar] job requirements and similar[] ... terms of payment provisions." *Heeg*, 907 F. Supp. 2d at 862 (internal quotation marks and citation omitted). "Plaintiffs are generally required to have held similar jobs, because the nature of the work performed by each plaintiff will determine either (a) whether an FLSA violation occurred and (b) whether a relevant FLSA exemption applies." *Tamez v. BHP Billiton Petroleum (Americas), Inc.*, No. 5:15-CV-330-RP, 2015 WL 7075971, at *3 (W.D. Tex. Oct. 5, 2015).

The *Tamez* case is particularly instructive. In *Tamez*, the plaintiff asked the court to conditionally certify a proposed class consisting of "all BHP Billiton employees who were paid a day rate, regardless of the nature of their responsibilities." *Id.* at *2. This broad definition included employees with at least eight different job titles and job responsibilities. *Id.* BHP Billiton argued that due to the stark differences between the duties and responsibilities of each job title, the proposed "class members ... [were] not similarly situated." *Id.* The *Tamez* court rejected BHP Billiton's argument, finding that (1) Tamez's day rate allegation amounted to a per se FLSA violation that did not depend on the job title or responsibilities of each particular plaintiff; and (2) BHP Billiton had failed to demonstrate why any differences in job titles and responsibilities among class

members would be relevant given the day rate allegation. *Id.* at \*3–4. Based on these findings, the *Tamez* court conditionally certified the class, explaining:

> The class definition proposed by Plaintiffs is admittedly broad. But, the Court nonetheless finds that dissimilar job responsibilities among the class have not been shown to be relevant to the Plaintiffs' FLSA allegations and, thus, are not a barrier to conditional certification.

*Id.* at \*4.

Like *Tamez*, the FLSA violation alleged in this case does not depend on the job title or responsibilities of each particular plaintiff. Wade alleges that he was paid a fixed amount per day without regard for the number of hours worked—i.e., without regard for whether he worked in excess of 40 hours each work week. If true, such a compensation scheme is a per se violation of the FLSA, and Furmanite would be in violation of the FLSA with regard to every putative plaintiff regardless of their particular job position. Because Wade alleges that the compensation scheme is in of itself a violation of the FLSA, "liability can be determined collectively without limiting the class to a specific job position." *Id.* at \*3.

Furmanite has demonstrated that Tulsa Group Inspectors include employees with a wide range of job titles, including Chief Inspector, Assistant Chief Inspector, Lead Welding Inspector, Welding Inspector, Lead Utility Inspector, Utility Inspector, Coating Inspector, and Right-Of-Way Inspector. Furmanite forcefully argues that each of these positions has different job duties and responsibilities, which militates strongly against finding such employees similarly situated for the purposes of conditional certification. (Dkt. 21 at 12–15). However, Furmanite has not shown why these differences are

relevant given the claims and defenses asserted. This is fatal to Furmanite's argument because "[a] class that encompasses a wide range of job positions may be conditionally certified as long as the differences between class members are not material to the allegations in the case." *Tamez*, 2015 WL 7075971, at *4 (collecting cases).

Furmanite also argues that "Plaintiff's off-the-clock claims require individual inquiry that makes collective treatment inappropriate." (Dkt. 21 at 24). This argument misunderstands Wade's claim. As the Court understands, Wade is not arguing that an off-the-clock violation occurred. Indeed, Wade explicitly indicates as much in his reply brief. (Dkt. 24 at 13) ("This case is not an 'off the clock' case."). Rather, Wade argues that time records were kept, but "Furmanite ignored th[o]se time records and did not calculate pay based upon the records" and instead "paid a flat day rate for all hours worked without any additional payment for overtime." (*Id*. at 14). In this regard, Furmanite's argument misses the mark.

Consequently, at this stage, the Court finds that Wade has demonstrated "a reasonable basis for the allegation that a class of similarly situated persons exists" for purposes of conditional certification. *Maynor*, 2008 WL 2220394, at *7. *See also Tice v. AOC Senior Home Health Corp.*, 826 F. Supp. 2d 990, 995–96 (E.D. Tex. 2011) (in order to establish whether members of a proposed FLSA class are similarly situated, the Court assesses whether they "performed the same basic tasks and were subject to the same pay practices"). Accordingly, conditional certification and issuance of notice is warranted.[4]

---

[4] Once discovery advances, Furmanite is free to move for decertification, at which time there is a more rigorous determination as to whether the plaintiffs are similarly situated such that the action

## B.    CLASS DEFINITION

"When a plaintiff seeks certification to bring a collective action on behalf of others and asks the court to approve a notice to potential plaintiffs, the court has discretion to approve the collective action and facilitate notice to potential plaintiffs. The court also has discretion to modify the proposed class definition if it is overly broad." *Hernandez*, 191 F. Supp. 3d at 679 (citations omitted). *See also Heeg*, 907 F. Supp. 2d at 861 ("A court also has the power to modify an FLSA collective action definition on its own if the proposed class definition does not encompass only similarly situated employees.") (internal quotation marks and citation omitted).

The Court requested both parties to submit proposed class definitions. Wade proposes the following class definition:

> All inspectors that were employed out of Defendant's Tulsa branch office and employed by Defendant for at least one week during the three-year period prior to the filing of this Complaint to the present.

(Dkt. 34 at 2). At oral argument, Furmanite indicated its belief that any class definition based around Tulsa Group Inspectors should be limited to include only those employees who worked on projects where the contracting third party paid Furmanite based on a day rate. Furmanite indicated that only two companies paid in such a manner. Furmanite explained this position by contending that during their employment, Wade and Boyd both worked solely on projects where the contracting third party paid Furmanite based on a

should be tried collectively. *See Mooney*, 54 F.3d at 1214. There are plenty of examples in which courts have decertified a collective action at this second stage after it had previously approved conditional certification. *See, e.g., Lipnicki v. Meritage Homes Corp.*, No. 3:10-CV-605, 2014 WL 5620603 (S.D. Tex. Nov. 4, 2014).

day rate; and thus, any prospective certified class should be limited to Tulsa Group Inspectors who worked on projects sharing the same arrangement. Furmanite's proposed class definition, provided at the request of the Court without waiving its objections to conditional certification, provides as follows:

> All inspectors who were employed by Furmanite America, Inc. out of its Tulsa / FIS branch from May 25, 2015 to present, and who, through such employment, worked on a project(s) for Magellan Midstream Partners, LP and/or Algonquin Gas Transmission, LLC.

(Dkt. 33 at 2).

As explained above, the Court's finding regarding similarly situated does not turn on similarities in job duties and responsibilities. Rather, the finding turns on similarities in the purported pay scheme alleged by Wade—that is, Furmanite paid its Tulsa Group Inspectors a fixed amount per day, without regard for whether such hours were worked in excess of 40 hours, and although time records were kept, "Furmanite ignored th[o]se time records and did not calculate pay based upon the records" and instead "paid a flat day rate for all hours worked without any additional payment for overtime." (Doc. 24 at 14). Although Furmanite seeks to limit the class definition based on the specific manner that its customers paid, nothing in the record compels such a limitation at this stage. Moreover, although Furmanite claims that the type of pay discrepancies that caused Wade to file suit have not and cannot occur as to employees falling outside its proposed limitation, the Court is not persuaded that the mere existence of such an argument is sufficient reason to limit the class at this lenient notice stage—such an argument is better suited for advancement at the more rigorous second stage, decertification.

13

Although Furmanite's argument in favor of limiting the class is unpersuasive, the Court nonetheless concludes that a slight modification of Wade's proposed class definition is warranted. The Court modifies the class definition to explicitly identify Furmanite (Wade simply stated "Defendant") and to set forth an appropriate three year notice period.[5] Accordingly, the Court will conditionally certify the class as follows:

> All inspectors who were employed out of Furmanite America, Inc.'s Tulsa, Oklahoma branch office and employed by Furmanite for at least one week at any time from May 5, 2015, to the present.

## C. FORM OF NOTICE TO POTENTIAL PLAINTIFFS

Federal judges have the power to authorize the sending of notice to potential FLSA class members to inform them of the action and to give them the opportunity to participate by opting in. *See Hoffman–La Roche*, 493 U.S. at 169–70. "Notice is particularly important for FLSA collective actions as potential plaintiffs' statutes of

---

[5] Wade seeks to have the notice period run three years from the date his complaint was filed. Furmanite argues the notice period should run from the date that this order approving certification is filed. There is some authority supporting both positions, but the more persuasive authority counsels in favor of the notice period beginning from the court's approval of notice. As succinctly explained by Judge Sim Lake:

> An FLSA cause of action "may be commenced within two years after the cause of action accrued ... except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). "Based on the statute of limitations, courts have recognized that class certification is appropriately limited to workers employed by the defendant up to three years before notice is approved by the court." *Tolentino v. C & J Spec Rent Services Inc.*, 716 F. Supp. 2d 642, 654 (S.D. Tex. 2010). "Thus, the notice period must commence three years prior to the court's approval of notice." *Id.*

*Baucum v. Marathon Oil Corp.*, No. CV H-16-3278, 2017 WL 3017509, at *3 (S.D. Tex. July 14, 2017). *See also Quintanilla v. A & R Demolitina, Inc.*, No. CIV. A. H-04-1965, 2005 WL 2095104, at *16 (S.D. Tex. Aug. 30, 2005) (explaining "class certification is appropriately limited to workers employed by the defendant up to three years before notice is approved by the court.").

limitations continue to run unless and until a plaintiff 'gives his consent in writing to become a party and such consent is filed in the court in which such action is brought.'" *Gronefeld*, 2016 WL 8673851, at * 5 (citing 29 U.S.C. § 216(b)). It is well-settled that courts have wide discretion in deciding the content of the notice and how notice is distributed. *See Jackson v. Superior Healthplan, Inc.*, No. 3:15-CV-3125-L, 2016 WL 7971332, at *6 (N.D. Tex. Nov. 7, 2016) (citing *Hoffmann-La Roche*, 493 U.S. at 171) ("Because conditional certification is proper in this action, judicial approval of the form, content, and delivery method for a collective action notice is appropriate.").

Furmanite lodges several objections to Wade's proposed notice to potential class members. Specifically, Furmanite contends that (1) notice should not be sent to potential plaintiffs by email; (2) the notice period should be 45-days instead of the 60-days proposed by Wade; and (3) Wade's counsel's contact information should not be included in the notice. Each of these objections is overruled as more fully discussed below.

### 1.    Should Notice be sent to Potential Class Members by Email?

Wade has requested that this Court approve sending notice to potential class members by both first-class mail and email. Furmanite opposes distribution of notice through email, wishing to stick to the traditional delivery route by first-class mail. Furmanite contends that sending notice by mail alone is sufficient to ensure that potential plaintiffs receive notice of this case. This Court strongly disagrees.

Over the years, Americans have experimented with various means to deliver messages and notices, including the Pony Express, telegrams, and faxes—all now (or soon to be) considered relics of a bygone era. Truth be told, first-class mail is probably

15

heading towards the same fate.[6]  The reality of busy, working life and the advent of modern technology results in stacks of unopened mail collecting on countertops and dining tables across this great nation.

Since the purpose of notice is to inform potential class members of the lawsuit and provide them the opportunity to join the case, this Court will encourage all efforts aimed at ensuring that potential plaintiffs discover that this action is pending.  It is true that mail can be, at times, an effective means of communication, but that does not mean we should ignore technological advances.  If society, back in the days of Julius Caesar, flatly refused to search for faster and more reliable delivery methods, we would be stuck using carrier pigeons to communicate over long distances.

Today, millions of Americans rely on email as their primary method for communication.  *See, e.g., Gronefeld*, 2016 WL 8673851 at *6 ("email is not the wave of the future ... it is the wave of the last decade and a half") (quotation marks, alterations, and citation omitted).  Email is universally hailed as an effective communication tool and it makes little sense to pretend that it would not be helpful when sending out class notice, especially when it costs absolutely nothing.  Not surprisingly, courts in this District regularly allow for notice to be delivered via both email and regular mail.  *See, e.g., Hernandez*, 191 F. Supp. 3d at 684 (ordering defendants to produce the known email addresses of its employees for notice); *Jones*, 149 F. Supp. 3d at 777 (ordering production of regular and email addresses for the purpose of facilitating notice).  The

---

[6] Indeed, only a scintilla of this Court's many notices are dispatched these days via traditional first-class mail.  Most are sent to counsel by email.

notion that providing email addresses of potential plaintiffs unnecessarily invades those person's privacy interests is unavailing. Unlike social security numbers, email addresses are freely exchanged and readily available to anyone who makes a concerted effort to uncover such information.

When playing darts, one has a much better chance of hitting a bull's-eye if he uses more than one dart. The same reasoning applies here. Utilizing two means of delivery—first-class mail and email—is more likely to result in potential plaintiffs receiving notice of the lawsuit than by a single delivery method. The distribution of notice via traditional mail and email is particularly appropriate, where, as here, employees are known to work away from home for long periods of time.[7] *See Jones*, 149 F. Supp. 3d at 776 ("The court finds that plaintiff's requests for e-mail addresses ... [is] not unduly burdensome or invasive, and [is] appropriate and necessary in this case because they are intended to further the broad remedial purposes of the FLSA by providing notice to employees whose work undisputedly requires them to travel to oilfields and stay away from home for days at a time.").

Although email might be a useful means of providing notice today, nobody should be surprised if, in the very near future, even email is ineffective in reaching potential

---

[7] Wade and Boyd both state in their declarations:

> Inspectors routinely travel away from home for extended periods of time to perform their work. When I worked away from home, I did not have access to the mail that was sent to my home while I was away performing my duties for Furmanite. I believe the same is true for other Inspectors.

(Dkts. 18-1 at 2 and 18-2 at 2).

class members. This is because younger individuals are much more likely to eschew email communications and, instead, maintain an active social networking presence:

> If there's any clue from the behavior of teenagers as to the direction of a given technology, email appears, well, doomed. Teens barely use it (or Facebook for that matter), opting instead for text messaging and chatting on platforms like Snapchat and Instagram. Three-quarters of teens regularly text one another, according to a 2012 Pew study, while just 6 percent of them exchange emails routinely.

Adrienne Lafrance, *The Triumph of Email: Why Does One of the World's Most Reviled Technologies Keep Winning?*, THE ATLANTIC (Jan. 6, 2016), https://www.theatlantic.com/technology/archive/2016/01/what-comes-after email/422625/. As expected, courts across the country are adapting with the times, taking steps to maximize the effectiveness of class notice through the use of social media. *See Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-CBS, 2017 WL 4418684, at *6 (D. Colo. Apr. 28, 2017) ("The Court agrees that electronic notice through social media platforms is particularly appropriate for classes comprised of largely young, largely transient unnamed plaintiffs, because email addresses and physical addresses may not provide a reliable, durable form of contact.") (internal quotations, ellipses, and citation omitted); *Mark v. Gawker Media LLC*, No. 13-CV-4347 (AJN), 2014 WL 5557489, at *5 (S.D.NY. Nov. 3, 2014) ("To the extent Plaintiffs propose to use social media to provide potential plaintiffs with notice that mirrors the notice otherwise approved by the Court, that request is granted."). This is a trend that is sure to continue into the future.

Furmanite also objects to Wade's proposal to permit plaintiffs to opt-in to the collection action using electronic signatures to reflect consent. This objection is baseless

given recent technological advances which have made electronic signatures trustworthy, valid, and enforceable. As such, courts routinely permit opt-in members in FLSA collective actions to execute their consent by means of electronic signature. *See, e.g., Dyson v. Stuart Petroleum Testers, Inc.*, 308 F.R.D. 510, 518 (W.D. Tex. 2015) (stating that "the Court concludes Plaintiff may employ its proposed electronic signature method for execution of consent forms") (collecting authorities); *Aguirre v. Tastee Kreme #2, Inc.*, No. CV H-16-2611, 2017 WL 2350064, at *8 (S.D. Tex. May 31, 2017) (stating that "[t]he court finds that allowing electronic signatures is appropriate"). There is no reason to vary from this general practice.

In summary, this Court will permit notice to be sent by first-class mail and email in an effort to further the remedial purposes of the FLSA. This Court will also permit potential plaintiffs to execute consent by means of electronic signature.

### 2.     How Long Should the Notice Period be?

Furmanite objects to Wade's proposed 60-day notice period, baldly asserting that 45 days is more than a sufficient time for a notice period. Notably, Furmanite does not provide any explanation as to why a 45-day notice period—rather than a 60-day notice period—is appropriate in this case. "Although opt-in periods commonly range from as little as 30 to as many as 120 days, most courts appear to default to a notice period of 60 days, unless potential plaintiffs are difficult to contact because of their locations or other extenuating factors warrant additional time." *McCloud v. McClinton Energy Grp., LLC*, No. 7:14-CV-120, 2015 WL 737024, at *10 (W.D. Tex. Feb. 20, 2015) (collecting cases). Given that the "FLSA is a remedial statute that has been construed liberally to apply to

the furthest reaches consistent with congressional direction," there is certainly no reason in this case for a downward departure from the 60-day default notice period. *Prickett v. DeKalb Cty.*, 349 F.3d 1294, 1296 (11th Cir. 2003) (internal quotation marks and citation omitted). Therefore, this Court finds that the 60-day notice period is reasonable.

### 3.    What Contact Information Should be Included on the Notice?

Furmanite objects to the inclusion of Wade's counsel's contact information on the notice, but fails to offer any justification or legal authority supporting such an objection. In FLSA collective actions, plaintiffs' counsel are typically responsible for distributing notice and common sense dictates that potential class members should be able to reach out to plaintiffs' counsel to ask questions as part of their decision making process on whether to join the lawsuit. Accordingly, this Court holds that the notice sent out to prospective class members should include Wade's counsel's contact information.

Furmanite next argues that if Wade's counsel's contact information is listed on the notice, the notice should also include contact information for Furmanite's attorneys. The Court disagrees. There is simply no logical reason that the notice should include the name and contact information for Furmanite's counsel. Courts generally refuse to include contact information for defense counsel in the class notice, "express[ing] reservations on ethical grounds about post-certification communications between defendant's counsel and potential opt-in class members." *Behnken v. Luminant Min. Co., LLC*, 997 F. Supp. 2d 511, 525 (N.D. Tex. 2014) (citing *Harris v. Vector Mktg. Corp.*, 716 F. Supp. 2d 835, 847 (N.D. Cal. 2010)). *See also Castillo v. Alkire Subway, LP.*, No. H-08-CV-2658, 2009 WL 9529354, at *6 (S.D. Tex. Apr. 30, 2009) ("[T]he Court agrees

with Plaintiffs that there is no need for the notice to contain Defense counsel's contact information."); *Gambo v. Lucent Techs. Inc.*, No. 05-C-3701, 2005 WL 3542485, at *7 (N.D. Il. Dec. 22, 2005) (explaining "there is no basis in law or logic for" the notice to include defense counsel's name and contact information). This Court will adhere to that general rule and instruct the parties not to include Furmanite's counsel's contact information in the class notice.

## IV. CONCLUSION

Plaintiffs have made a sufficient showing at this preliminary stage to warrant the issuance of notice, to permit full discovery, and to allow the Court to conduct a more rigorous analysis at the final decertification stage when it has the benefit of more information. As such, Plaintiffs' Motion is GRANTED. Conditional certification is granted for a class defined as follows:

> All inspectors who were employed out of Furmanite America, Inc.'s Tulsa, Oklahoma branch office and employed by Furmanite for at least one week at any time from May 5, 2015, to the present.

Within fourteen (14) days of the entry of this Memorandum Opinion and Order Furmanite shall provide Wade with a list of all employees fitting the description of the conditionally certified class in a usable electronic format. This list shall include each individual's full name, last known mailing address, e-mail address (if known), telephone number, and date(s) of employment. Wade shall have fourteen (14) days from the receipt of this information to mail notice to the potential class members. The opt-in period shall be sixty (60) days from the date the notice is mailed.

SIGNED at Galveston, Texas, this 4th day of May, 2018.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE